UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED ASSOCIATION UNION
LOCAL NO. 290, on behalf of U.A.U. Local
No. 290 Plumber, Steamfitter & Shipfitter
Industry 401(k) Plan and Trust,

        Plaintiff,

    v.                                              Civil No. 07-1521-HA
                                   (Lead Case)

FEDERAL INSURANCE COMPANY,
                                CONSOLIDATED CASES

        Defendant.                          OPINION AND ORDER

_____

HAGGERTY, Chief Judge:

     This matter comes before the court on defendant Federal Insurance Company's Motion

for Summary Judgment [9] and plaintiff United Association Union Local No. 290's Motion for

Partial Summary Judgment [19].  The court heard oral argument on July 21, 2008.  For the

PAGE 1 - OPINION AND ORDER

following reasons, defendant's summary judgment motion is granted and plaintiff's summary

judgment motion is denied.[1]

## BACKGROUND

This lawsuit arises out of a series of investment frauds perpetrated by Capital

Consultants.  Capital Consultants, LLC ("CCL"), and its predecessor, Capital Consultants, Inc.,

provided investment management services to corporations, pension and other retirement plans,

foundations, and wealthy individuals.  CCL was run by Jeffrey Grayson ("Grayson"), its

chairman and chief executive officer; Barclay Grayson, its president; Dean Kirkland, its senior

vice president and chief salesman; and Linda Lucas, its chief financial officer.  Approximately

301 plans subject to ERISA, including plaintiff's, had assets under CCL management.

### 1.    The Policy

Defendant issued Pension and Welfare Fund Fiduciary Dishonesty Policy number 8125-

80-19 to United Association Union Local No. 290 ("Local 290"), effective from 1993 to 2003.

During this ten year period, the policy was renewed three times: first on November 18, 1994,

again on November 18, 1997, and then again on November 18, 2000.  The relevant portions of

this policy are listed below:

**a. Declarations Page** - lists the liability limit as "(Any One Loss) $1,000,000."

**b. Insuring Clause:**
The Company agrees to pay and make good to the Insured all such losses as any
such Insured may during the policy period sustain or discover it has sustained of
money, securities and other property through any fraudulent or dishonest act or

---

[1]This case is identical to two other cases filed in this court alleging breach of the same
Pension and Welfare Fund Fiduciary Dishonesty Policy.  Plaintiff also filed complaints against
defendant on behalf of Local No. 290 Plumber, Steamfitter, and Shipfitter Industry Pension Plan
and Trust and Local No. 290 Plumber, Steamfitter, and Shipfitter Industry Health and Welfare
Plan and Trust.
    In addition, six other cases have been consolidated for the purposes of pretrial motions.

acts (including larceny, theft, embezzlement, forgery, misappropriation, wrongful abstraction, wrongful conversion or willful misapplication) committed by any Employee or Employees, acting alone or in collusion with others.
"Employee" or "Employees" means, respectively, any one or more of the natural persons while in the service of any Employee Benefit Plan (included as Insured herein) as fiduciary, trustee, administrator, officer or employee and any other natural person required to be bonded by Title 1 of the Employee Retirement Income Security Act and also included any ex-Employee during a period not exceeding thirty (30) days following the termination of such service.

**c. Non-Accumulation of Liability:**

Regardless of the number of years this policy shall continue in force, and the number of premiums which shall be payable or paid or any other circumstances whatsoever, the liability of the Company under this policy with respect to any loss or losses shall not be cumulative from year to year or from period to period.

**d. Limitation of Coverage:**

This policy does not cover any loss caused by any Employee who, to the best knowledge of any administrator or officer of the Insured (not in collusion with such Employee), has committed any fraudulent or dishonest acts in the service of the Insured or otherwise, whether such act be committed before or after the date of such service . . . .

**e. Discovery Period:**

This policy does not cover any loss not discovered within twelve (12) calendar months following the termination of this policy as an entirety or any loss sustained by any Plan not discovered within twelve (12) calendar months following the termination of this policy as to such Plan.

**f. Joint Insured:**

The total liability of the Company for loss or losses sustained by any or all Plans included herein shall not exceed the amount of coverage specified herein and the Company shall not be liable for loss sustained by any one Plan to the advantage of any other Plan . . . .

**g. Payover:**

In compliance with Title 1 of the Employee Retirement Income Security Act of 1974, payment by the Company under this policy to the Principal Insured shall be held by such Insured for the use and benefit of any Employee Benefit Plan(s) sustaining a loss. * * *

**h. Total Liability:**

The payment of any loss under this policy shall not reduce the liability of the Company for other losses whenever sustained; provided, however, that the total

liability of the Company for any loss or losses caused by any Employee or in which such Employee is concerned or implicated, is limited to the amount of coverage specified herein.

**i.  Termination As To Any Employee:**
This policy shall terminate as to any Employee (1) immediately upon discovery by any officer of the Insured (not in collusion with such Employee) or any fraudulent or dishonest act on the part of such Employee, without prejudice to the loss of any property then being conveyed by such Employee outside of the Insured's

premises . . . .

**2.      The Unfolding Facts**

On September 21, 2000, the Securities and Exchange Commission filed a lawsuit against

CCL, Jeffrey Grayson, and Barclay Grayson.  The complaint accused CCL and its principals of

engaging in a Ponzi-like scheme to conceal a nonperforming $160 million loan to the Wilshire

Credit Corporation (the "WCC loan").  When Wilshire Credit began experiencing financial

difficulties in 1998, CCL continued to report to clients that the loan had a value of $160 million.

CCL made representations that the WCC loan was sold to two other entities, Sterling Capital,

LLC and Brooks Financial, LLC.  In fact, CCL loaned an additional $71 million of client funds

to those entities so they could make loan payments on the WCC loan.  As a result of the criminal

lawsuit, CCL was immediately placed into receivership.

On September 29, 2000, a civil lawsuit was filed against Grayson and a number of co-

defendants (the "Hazzard complaint").  The Hazzard complaint alleged the same fraudulent

transactions as the criminal lawsuit and listed Local No. 290 Plumber, Steamfitter, and Shipfitter

Industry 401(K) Plan and Trust as a plaintiff.

In the course of the continuing investigations into CCL's dealings, a number of other

fraudulent or risky transactions were uncovered, including loans involving Homer G. Williams;

loans made to Washington Alder, LLC for the purchase of a lumber mill; loans to Bayside, Ltd. and Calafate Cayman Holdings, Inc. for a timber purchase; and several other suspicious transactions. The court notes that it is unclear when plaintiff learned about each of these additional dishonest acts.

Taken together, the nine plaintiffs in the consolidated cases allege gross losses in excess of $184 million. After distributions from the CCL receivership and third-party recoveries, their alleged losses are still in excess of $77.3 million.

Defendant was notified of an impending claim on December 7, 2000. On January 3, 2001, plaintiff and the other policyholders submitted a combined Proof of Loss to defendant. The parties executed a tolling agreement effective June 13, 2001.

## STANDARDS

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see Bahn v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). The moving party carries the initial burden of proof and meets this burden by identifying portions of the record on file that demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the initial burden is satisfied, the burden shifts to the non-moving party to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Id.*

When resolving contractual disputes, federal district courts are guided by pertinent state law. *CRST Van Expedited, Inc., v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1111 (9th Cir. 2007) (applying Oregon law and observing that the Supreme Court's decision in *Erie v. Tompkins*, 304 U.S. 64 (1938), "requires federal courts sitting in diversity to apply state

substantive law and federal procedural law").  "As a general rule, the construction of a contract is a question for the court and is treated as a matter of law."  *May v. Chicago Ins. Co.*, 490 P.2d 150, 153 (Or. 1971).

## ANALYSIS

Defendant has tendered a $1 million check to Local 290.  Defendant asserts that this $1 million payment exhausts its financial responsibility under the fiduciary dishonesty policy.  Plaintiff alleges that this payment is insufficient because (1) the policy did not establish an annual $1 million policy limit, (2) Local 290 can make separate recoveries from three coverage periods, and (3) the Employee Retirement Income Security Act of 1974 ("ERISA") requires a greater level of coverage.

### 1.    The Policy's Limits of Liability

Neither party disputes that Grayson is a fiduciary whose fraudulent conduct is covered by Local 290's policy.  Although the parties agree that Grayson's misdeeds trigger coverage, they disagree regarding the amount of defendant's obligation.  Defendant asserts that it has paid the $1 million policy limit and exhausted its duty; plaintiff argues that the policy limit was unclear and that Local 290 is entitled to a greater level of coverage.  This disagreement is caused by the language of the Declarations section, which states the following: "Limits of Liability: Fiduciary Dishonesty Coverage (Any One Loss) $1,000,000."

The governing rule of construction for insurance contracts is to ascertain the "intention of the parties based on the terms and conditions of the insurance policy."  *Hoffman Constr. Co. of Alaska v. Fred James & Co.*, 836 P.2d 703, 706 (Or. 1992).  The Oregon Supreme Court has established a three-part test for courts to follow when interpreting an insurance contract

provision.  *See Eagle Industries, Inc. v. Thompson*, 900 P.2d 475, 478-79 (Or. 1995); *Hoffman*, 836 P.2d at 709.

First, courts examine the plain meaning of any contested terms.  *Hoffman*, 836 P.2d at 706.  If both parties offer plausible interpretations of a term, courts proceed to the second step: whether the proffered interpretations are plausible in light of "the particular context in which that term is used in the policy and the broader context of the policy as a whole."  *Id*.  In doing so, courts examine whether each interpretation lets all provisions of the contract have meaning.  *Id*. at 707.  If the meaning of a term remains ambiguous, however, courts proceed to the third step and construe the policy against the insurer.  *Id*. at 706.

Beginning with the first step, both parties introduce plain meaning interpretations of the Declarations' liability limit.  Plaintiff argues that the policy promises to pay $1 million for each loss caused by the fraudulent acts of Grayson.  They point out that the Declarations specifies "(Any One Loss)" will be covered up to $1 million.  Thus, if Grayson's actions caused the plaintiff to sustain ten separate losses, Local 290 argues that defendant should provide up to $10 million in total coverage.

Defendant, however, argues that the Declarations' liability limit is modified by the policy's Total Liability clause.  This clause states that "the total liability of the Company for any loss or losses caused by any Employee or in which such Employee is concerned or implicated, is limited to the amount of coverage specified herein."  *Supra* p. 3-4.  There is no dispute that the "amount of coverage specified herein" refers to the $1 million amount listed in the Declarations. Pl. UAU Local 290's Mem. in Supp. of Its Mot. for Partial Summ. J. and in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Mot. for Summ. J.") at 9.  According to defendant's interpretation, all of the fraudulent acts committed by a single fiduciary constitute "One Loss" with a $1 million

indemnity.  Defendant maintains that if ten fiduciaries independently embezzled $1 million, defendant would owe $10 million under the policy.  Since Grayson either caused or was otherwise involved in all of Local 290's losses,[2] however, defendant asserts that Local 290 is only entitled to the $1 million previously disbursed.

This court finds that both parties have put forward plausible interpretations of "(Any One Loss) $1,000,000."  The court in *Hoffman*, however, cautioned that "given the breadth and flexibility of the English language, the task of suggesting plausible alternative meanings is no challenge to capable counsel."  836 P.2d at 706.  Thus, the court must proceed to the second step and examine the context in which that term is used.

Plaintiff argues that defendant's interpretation is unreasonable given the context in which it is used.  The court concludes that there is little merit to this argument.  For instance, plaintiff claims that defendant's interpretation excises the qualifying phrase "(Any One Loss)" from the Declarations: "the Trusts see '$1,000,000 for 'Any One Loss,' whereas defendant sees just '$1,000,000.'"  Pl's Mot. for Summ. J. at 19.  This is an oversimplification, however, of defendant's argument.  Defendant asserts that the Total Liability clause helps define "(Any One Loss)" as all "loss or losses" in which a fiduciary is involved.  Defendant's interpretation does not excise "(Any One Loss)"; rather, it provides a contextual definition.  Although plaintiff highlights several alleged inconsistencies in the policy, none of them render defendant's interpretation unreasonable.  Having examined the four corners of the contract, the court concludes that defendant's interpretation gives full effect to every clause of the policy.

---

[2] "The Trusts do not dispute that Jeff Grayson, CCL's President, was concerned or implicated in the frauds described in their Proofs of Losses, but that is not the point."  Pl.'s Mot. for Summ. J. at 19.

Plaintiff also argues, in the alternative, that both parties' interpretations are reasonable and that the contract should be construed against defendant. In doing so, plaintiff relies heavily on *Universal Underwriters Insurance Co. v. Ford*, 734 So. 2d 173 (Miss. 1999). In *Universal Underwriters*, the Mississippi Supreme Court considered whether an insured could separately recover for each act of embezzlement by a single employee. The total liability provision in *Universal Underwriters* restricted reimbursement to the "limit stated in the declarations as applicable to a LOSS caused by one or more EMPLOYEES, or to all LOSS caused by one EMPLOYEE or in which the EMPLOYEE is concerned or implicated . . . ." *Id.* at 174-75. The policy's declarations stated a flat limit of "$10,000 with a $250 deductible." *Id.* at 174.

Similar to defendant, the insurer in *Universal Underwriters* argued that numerous acts of embezzlement by an employee constituted a single loss, subject to the $10,000 policy limit. And, like Local 290, the insured in *Universal Underwriters* argued that the policy allowed separate recoveries for each fraudulent act. Siding with the plaintiff, the *Universal Underwriters* court pointed out that "there is no language stating that multiple acts or a series of related acts may be treated as one occurrence of loss,." *Id.* at 178 n.1. Accordingly, the court concluded that the contract was ambiguous and applied the $10,000 limit to each act of embezzlement. *Id.* at 178.

Although *Universal Underwriters* closely resembles the instant case, it is unconvincing for two reasons. First, the case was not decided under Oregon law and is, therefore, of only persuasive value. Second, and more importantly, it was decided on different policy language. The Total Liability clause provides that defendant's "total liability . . . for any loss or losses caused by any Employee or in which such Employee is concerned or implicated," is limited to the amount specified on the Declarations page. Unlike the policy in *Universal Underwriters* that

referred to "all LOSS" caused by an employee, plaintiff's policy includes the critical phrase "or losses."

The phrase used in *Universal Underwriters*, "all LOSS," is ambiguous: It could be referring to either every fraudulent act an employee commits or the entire loss from a single fraudulent act. The phrase "any loss or losses," however, is not ambiguous: It clearly establishes that any fraudulent act or acts committed by a fiduciary are subject to a single policy limit. It supplies the language, missing from *Universal Underwriters*, that multiple events may be treated as one occurrence of loss.

In resolving this issue, the court need look no further than *Hoffman Construction Co. of Alaska v. James*. The court in *Hoffman* concluded that an insurance contract was unambiguous since "[d]efendant's interpretation lets all provisions have meaning; plaintiffs' would not. We assume that parties to an insurance contract do not create meaningless provisions." 836 P.2d at 707. Applying the same logic to the policy issued by defendant, a similar conclusion is reached. If plaintiff were permitted to recover $1 million for each of Grayson's fraudulent acts, the Total Liability clause would be rendered meaningless. Unlike the policy in *Universal Underwriters*, the Total Liability clause specifies that the policy limit applies to either a "loss" or the "losses" caused by a fiduciary's dishonesty. Since the Total Liability clause clearly establishes that a single policy limit applies to every loss involving Grayson, only defendant's proffered interpretation of the term "(Any One Loss) $1,000,000" is reasonable because it does not require the nullification of other parts of the policy.

Since the contract is unambiguous, the court need not resort to the third step–construing the ambiguity against the insurer. Instead, the court must construe the policy in accordance with

the only reasonable interpretation and apply the $1 million limit to all losses caused by Grayson or in which Grayson is concerned or implicated.

### 2.      Different Coverage Periods

Plaintiff next argues that Local 290 is entitled to recover the policy limit three times, once for each policy renewal period.[3]  Plaintiff asserts that even if defendant is correct about the Total Liability provision, Local 290 is entitled to recover up to $3 million–the $1 million limit in each of their three policy periods.  Because they involve different legal arguments, the 1994-1997 period and the 2000-2003 period will be discussed separately.

### a.      The 1994-1997 Period

To establish its claim under the 1994-1997 period, plaintiff relies upon *Robben & Sons Heating, Inc. v. Mid-Century Insurance Co.,* 189 P.3d 1141 (Or. Ct. App. 2003).  In *Robben*, the Oregon Court of Appeals concluded that "the fact that [the insurer] paid the coverage limits for one policy period does not relieve it from paying under the coverage limits for the second policy period." *Id.* at 1145.  The insurer in *Robben* issued two policies covering successive periods. Both policies indicated that only events occurring during the policy period were covered and that, "[r]egardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period." *Id.* at 1143.  The court reasoned that the "implication of those provisions is that the renewal of a policy is intended to create a new insurance contract, discrete from the contract for the previous policy period." *Id.* at 1144.  That understanding was supported by the language of the declarations page, which provided that the policy "'will not take effect until the other coverage ends . . . . [i]f we elect to

---

[3] Plaintiff does not allege that any losses were sustained during the original 1993-1994 policy period.

continue this insurance, we will renew this policy if you pay the required renewal premium for each successive policy period . . . .'" *Id.* Because the insurer furnished separate declarations pages and the insured paid additional premiums, the court held that the two policies were independent, each with its own coverage limits.

Unlike the plaintiff in *Robben*, however, Local 290 does not argue that the three different policy periods are discrete.  In fact, plaintiff asserts:

> Federal did nothing to differentiate the 1994-1997 and 1997-2000 renewal periods.  Each period has the same suffix: 8125-80-19B.  No replacement policy forms were issued at the time of the 1997 renewal.  And, most telling of all, the 1997-2000 renewal statement came with a letter from Federal stating: "Please find enclosed our premium bill in the amount of $4,166 for the three year prepaid term November 1[8], 1997 to November 18, 2000.  The policy is continuous, therefore this premium bill is all you will receive."

Pl.'s Mot. for Summ. J. at 30.

Plaintiff's attempts to establish a continuous policy are necessitated by the policy's Discovery Period clause.  The Discovery Period clause states that the policy "does not cover any loss not discovered within twelve (12) calendar months following the termination of this policy as an entirety or any loss sustained by any Plan not discovered within twelve (12) calendar months following the termination of this policy as to such Plan." *Supra* p. 3.  Plaintiff, however, has not alleged that it discovered any losses before November 1998, twelve months after the 1994-1997 policy expired.  Instead, plaintiff argues that the one-year discovery period only commences upon the termination of the "policy as an entirety," not at the end of each renewal period.

Plaintiff is caught in a double bind.  Even if the court accepts plaintiff's theory that renewal periods do not trigger the Discovery Period clause, the 1994-1997 period is still subject to the Non-Accumulation of Liability clause.  This clause provides that "any loss or losses shall

not be cumulative from year to year or from period to period." *Supra* p. 3. If the 1994-1997 and 1997-2000 policy periods are, in fact, continuous, the Non-Accumulation clause prevents plaintiff from recovering under the 1994-1997 policy period. In response, plaintiff argues that "[u]nder *Robben*, it is precisely because of the Non-Accumulation of Liability provision that the Policy provides new limits in each policy period . . . ." Pl. UAU Local 290's Reply in Supp. of Its Mot. for Partial Summ. J. at 12.

Plaintiff cannot have it both ways. Plaintiff can argue that *Robben* applies and that the 1994-1997 and 1997-2000 periods are independent policies. In that case, the Discovery Period clause is applicable and plaintiff cannot recover under the 1994-1997 policy. Alternatively, plaintiff can argue that there is a single, continuous policy, with 1997-2000 functioning as a renewal period. In that case, *Robben* does not apply and the Non-Accumulation of Liability clause is applicable. Either way, plaintiff's argument fails and Local 290 cannot recover under the 1994-1997 period.

### b.    The 2000-2003 Period

Plaintiff also argues that it can recover under the 2000-2003 policy period. Defendant contends that coverage under the 2000-2003 policy period is barred by the policy's terms and by the known loss doctrine.

The court agrees that the policy's terms prevent recovery under the 2000-2003 policy. The Limitation of Coverage section of the policy states:

> This policy does not cover any loss caused by any Employee who, to the best knowledge of any administrator or officer of the insured (not in collusion with such Employee), has committed any fraudulent or dishonest acts in the service of the Insured or otherwise . . . .

*Supra* p. 3.  In addition, the Termination As to Any Employee clause provides that coverage "shall terminate as to any Employee (1) immediately upon discovery by an officer of the Insured (not in collusion with such Employee) of any fraudulent or dishonest act on the part of such Employee."  *Supra* p. 4.  These two provisions bar coverage for an implicated fiduciary from the moment knowledge of any "fraudulent or dishonest" act is acquired by the insured.

In late September 2000, Local 290 sued Grayson for fraud and breach of fiduciary duty. The 2000-2003 policy, however, did not become effective until November 18, 2000.  Thus, plaintiff had knowledge of fraudulent acts by Grayson at the policy's inception and those losses are not covered.

Plaintiff contends that it took months to unravel CCL's various misappropriations and that the plaintiff "had not yet discovered a host of losses [by November 2000]."  Pl.'s Mot. for Summ. J. at 34.  In addition, plaintiff asserts that the dishonesty of CCL employees Dean Kirkland and Linda Lucas was not known prior to November 18, 2000.  Local 290 argues questions of fact exist as to whether employees other than Grayson acted dishonestly, when the Trusts first discovered their dishonest conduct, and whether their conduct resulted in a loss or losses.

The court finds these arguments unpersuasive.  The policy issued by defendant terminates as to "any Employee" immediately upon discovery of their dishonesty.  Thus, knowledge of dishonest acts by Grayson was sufficient to terminate coverage for any undiscovered acts.  Since Local 290 was already aware of dishonest acts when the 2000-2003 policy began, Grayson was never a covered "Employee" under that policy.

Furthermore, the policy's Limitation of Coverage provision helps bar coverage for CCL employees whose exact involvement was unknown when the 2000-2003 policy began.  The

Limitation of Coverage provision specifies that the "policy does not cover any loss caused by any Employee who, to the best knowledge of any administrator or officer of the Insured (not in collusion with such Employee), has committed any fraudulent or dishonest acts . . . ." *Supra* p. 3.

Plaintiff admits that, given the "breadth and depth of CCL's varied schemes required manpower; Grayson could not do it alone." Pl.'s Mot. for Summ. J. at 38. At no point has plaintiff alleged that Kirkland or Lucas committed independent acts of fraud. In fact, counsel for plaintiff acknowledged at oral argument that "Jeff Grayson was at the top of the pyramid and he managed the enterprise, even though it took lots of people to make these schemes happen, but Jeff Grayson knew what was going on, as far as we can tell, in each of these [schemes]."

Since Kirkland and Lucas were acting under Grayson's management, it matters not when Local 290 became aware of their involvement. Plaintiff was aware of Grayson's malfeasance when the 2000-2003 policy commenced. Accordingly, the Limitation of Coverage provision prevents plaintiff from recovering for any loss or losses caused by Grayson, including acts that were nominally committed by Kirkland and Lucas.

Having concluded that the terms of the contract preclude coverage under the 2000-2003 policy, the court need not decide whether the known loss doctrine also prevents plaintiff from recovering.

### 3.    Statutory Incorporation

"In a number of circumstances the requirements of statutes and ordinances have been deemed covered by insurance policies that were procured for the purpose of complying with those requirements, adding to or displacing contrary provision of the policy itself." *Rhone v. Louis*, 580 P.2d 549, 550-51 (Or. 1978). Plaintiff argues that the underlying policy was procured

for the purpose of complying with ERISA's requirements, and that provisions of the policy

contrary to ERISA's requirements should be displaced.  Specifically, plaintiff argues that (1) the

policy's stated limits of liability do not satisfy ERISA's mandated minimum and (2) the liability

limits must apply annually, rather than to each three year policy period.

Plaintiff first points to § 412 of ERISA, which states that "[e]very fiduciary of an

employee benefit plan . . . shall be bonded" in a minimum amount:

> The amount of such bond shall be fixed at the beginning of each fiscal year of the
> plan.  Such amount shall be not less than 10 per centum of the amount of funds
> handled.  In no case shall such bond be less than $1,000 nor more than $500,000. .
> . .  For purposes of fixing the amount of such bond, the amount of funds handled
> shall be determined by the funds handled by the person, group, or class to be
> covered by such bond and by their predecessor or predecessors, if any, during the
> preceding reporting year . . . . Such bond shall provide protection to the plan
> against loss by reason of acts of fraud or dishonesty on the part of the plan
> official, directly or through connivance with others.

29 U.S.C. § 1112(a).  Plaintiff argues that applying the above formula to the funds managed by

CCL, ERISA required defendant to write the policy with a $2.15 million limit, instead of the $1

million limit stated in the Declarations.  Pl.'s Mot. for Summ. J. at 51.  Plaintiff also directs the

court's attention to regulations promulgated by the Department of Labor.  At 29 C.F.R. §

2580.412-16, the Department of Labor prescribes bond limits for different bond types and for

bonds under which multiple plans and trusts are jointly insured.  Subsection (a) of 29 C.F.R. §

2580.412-16 effectively recites the language in § 412 of ERISA and Subsection (b) states:

> When individual or schedule bonds are written, the bond amount of each person
> must represent not less than 10 percent of the funds "handled" by the named
> individual or by the person in that position.  When a blanket bond is written, the
> amount of the bond shall be at least 10 percent of the highest amount handled by
> any administrator, officer or employee to be covered under the bond.

Since insurance companies are responsible for writing policies, plaintiff argues that it was defendant's responsibility to write a policy with the correct amount of coverage.

Plaintiff also contends that the policy's Non-Accumulation of Liability provision is voided by ERISA.  Plaintiff quotes from 29 C.F.R. § 2580.412-19(a), which provides that "[t]here is nothing in the Act that prohibits a bond for a term longer than one year, with whatever advantages such a bond might offer by way of a lower premium.  However, at the beginning of each reporting year the bond shall be in at least the requisite amount."  Plaintiff argues that "under no circumstances can a trust receive less coverage under one three year bond than it would receive under three successive one year bonds."  Pl.'s Mot. for Summ. J. at 52.  Because the Non-Accumulation of Liability provision limits plaintiff to a single recovery under the 1997-2000 policy, Local 290 asserts it contravenes ERISA and must be reformed.

In *American States Insurance Co. v. Super Spray Service, Inc.*, the Oregon Court of Appeals held that an insurance contract incorporated the relevant Oregon statute.  713 P.2d 682 (Or. Ct. App. 1986).  The defendant in *Super Spray* operated a crop spraying service and accidentally sprayed the wrong fields with pesticide.  *Id.* at 683.  Under an Oregon statute, a pesticide operator was required to have liability insurance protecting against loss or damage to property resulting from the application of pesticides.  *Id.*  Plaintiff, however, had issued a liability policy to defendant that excluded coverage for "property damage arising out of the direct application of chemicals, whether intentional or in error."  *Id.*  Importantly, the policy also contained the following provision: "Statements in this policy conflicting with insurance statutes of [Oregon] are hereby amended by us to conform to the statutes."  *Id.*  Plaintiff conceded that this provision amended the policy to provide the liability coverage required by the statute.  *Id.*

There is no similar provision in the policy issued by defendant, indicating that the policy should be amended if it conflicts with ERISA or, indeed, any statute. The policy's only mentions of ERISA are in the Payover provision and in the Insuring Clause, which provides that:

> "Employee" or "Employees" means, respectively, any one or more of the natural persons while in the service of any Employee Benefit Plan (included as Insured herein) as fiduciary, trustee, administrator, officer or employee and any other natural person required to be bonded by Title 1 of the Employee Retirement Income Security Act and also included any ex-Employee during a period not exceeding thirty (30) days following the termination of such service.

*Supra* p. 3.

Even if plaintiff is correct that the policy "was clearly drafted exclusively for ERISA plans and trusts," more is needed under Oregon law. Pl.'s Mot. for Summ. J. at 48. Unlike the insurer in *Super Spray*, defendant denies that its policy was intended to satisfy all of ERISA's bonding requirements. And, unlike the insurance contract in *Super Spray*, there is no language in defendant's policy suggesting it was issued to satisfy ERISA's bonding requirements.

In *Super Spray*, the court relied on statutory incorporation because the policy itself required compliance with relevant statutes. Oregon courts have also relied on statutory incorporation when the statute itself was intended to regulate insurance contracts. *Safeco Insurance Co. of Am. v. Am. Hardware Mut. Insurance Co.*, 9 P.3d 749 (Or. Ct. App. 2000). The defendant in *Safeco*, American Hardware, issued a liability policy to an automobile dealership. *Id.* at 750. The policy stated that drivers were not covered in certain conditions, including if they possessed their own insurance. *Id.* A customer of the dealership, while test driving an automobile, was involved in an accident. *Id.* The customer's insurance company, Safeco, defended him in the ensuing litigation and paid a settlement. *Id.* Safeco then sued American

Hardware, seeking reimbursement and alleging that the policy's exclusions violated the Oregon financial responsibility law. *Id.*

The court in *Safeco* quoted several pertinent statutes. Oregon Revised Statutes § 742.450(2) provided that "[e]very motor vehicle insurance policy issued for delivery in this state shall contain an agreement or indorsement stating that, as respects bodily injury and death or property damage, or both, the insurance provides" the coverage described in O.R.S. 806.080(b) or other sections. Section 806.080(b) required that any policy "must include in its coverage all persons who, with the consent of the named insured, use the motor vehicles insured under the policy . . . ." Examining these statutes, the court concluded that because "American Hardware's policy violates the [financial responsibility law's] requirement to provide minimum coverage to all permissive users of its insured's vehicles, the policy must be construed to cover [the excluded driver]." *Safeco*, 9 P.3d at 755.

The statutes quoted in *Safeco* clearly regulated automobile insurance policies. Simply put, Oregon law prevented insurance companies from issuing policies that did not comply with the statutory requirements. ERISA, on the other hand, does not regulate insurance policies. Although the statute does mention bonding requirements, this is a directive towards the plans themselves, not the insurers.

The court is guided by *Joseph Rosenbaum, M.D. v. Hartford Fire Insurance Co.*, in which the Ninth Circuit explained that the burden of compliance with ERISA is on the plans and their insurance brokers, not on the insurer. 104 F.3d 258 (9th Cir. 1996). The plaintiff, Dr. Rosenbaum, created an ERISA plan for his professional corporation. *Id.* at 259. Dr. Rosenbaum invested the plan's money through Property Mortgage Company, Inc., which was managed by Stanley Glickman. *Id.* at 260. Property Mortgage eventually failed. *Id.* at 260. Dr. Rosenbaum

then sued Hartford Fire, which had issued an employee dishonesty bond to the plaintiff. *Id.* at 260.

The defendant in *Rosenbaum* argued that the bond's definition of "Employee" clearly excluded Glickman. *Id.* at 261. Much like Local 290, however, the plaintiff contended that the policy's language was trumped by ERISA. Specifically, plaintiff pointed out that ERISA required all plan officials to be bonded and that "'[s]uch bond shall provide protection to the plan against loss by reason of acts of fraud or dishonesty on the part of the plan official, directly or through connivance with others.'" *Id.* at 262 (quoting 29 U.S.C. § 1112(a)). Plaintiff asserted that the employee dishonesty policy must be read to meet ERISA's bonding requirements, thereby bonding Glickman. The Ninth Circuit, assuming *arguendo* that Glickman was a dishonest "plan official," nevertheless concluded that:

> The statute does not require that any bond be construed to cover all persons required to be bonded. It requires plan officials who receive, handle, disperse or exercise custody of plan money to be bonded . . . . If Mr. Glickman had to be bonded, then perhaps the Rosenbaums as trustees should not have invested the ERISA plan's money with Property Mortgage Company without ascertaining whether he was . . . . That they invested [] with Property Mortgage Company does not imply that their bond on Dr. Rosenbaum's employees, trustees et al. covered Property Mortgage Company's employees.

*Id.* at 263.

As plaintiff accurately points out, the *Rosenbaum* court was applying the statutory incorporation law of California. Although non-binding, this court nevertheless finds the Ninth Circuit's analysis of ERISA very persuasive. Local 290–not defendant–had the information necessary to determine the required coverage under ERISA and purchase a compliant bond. If ERISA required a greater amount of coverage than that provided by defendant's policy, it was plaintiff's responsibility to seek greater coverage.

The court, therefore, concludes that neither the policy nor the statute require that ERISA's bonding requirements be incorporated into the fiduciary dishonesty policy.

**CONCLUSION**

For the foregoing reasons, plaintiff's Motion for Partial Summary Judgment [19] is DENIED and defendant's Motion for Summary Judgment [9] is GRANTED.

IT IS SO ORDERED.

DATED this   11   day of August, 2008.


_____/s/ Ancer L. Haggerty_____
Ancer L. Haggerty
United States District Judge